IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELEANOR LISLE TATTAR** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| v. | : | |
| **IKEA NORTH AMERICA SERVICES, LLC** | : | **NO.** |
| Defendant. | : | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Eleanor Lisle Tattar ("Tattar"), by and through her undersigned attorneys, brings this Complaint against her former employer, IKEA North America Services, LLC ("IKEA"), for its violation of: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, as amended ("Title VII");[1] (2) the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); and (3) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3).  IKEA (1) paid Tattar less than a similarly situated male employee; (2) discriminated against Tattar because of her sex during her employment; and (3) terminated Tattar's employment on the basis of her sex and in retaliation for her opposition to IKEA's discriminatory practices.  IKEA's wrongful conduct violated the law and has caused and is causing Tattar substantial loss, pain, and suffering.

## PARTIES

1. Tattar is a citizen of the Commonwealth of Pennsylvania and currently resides at 106 Woods Lane, Wayne, Pennsylvania 19087.

---

[1] Tattar reserves her right to amend this Complaint to include claims under the Pennsylvania Human Relations Act, 43 P.S. §§951, *et seq.* ("PHRA") after the PHRC's one year period of exclusive jurisdiction over Tattar's PHRA claims expires.

- 1 -

2. IKEA is a multinational Swedish company that designs and sells ready-to-assemble furniture, home accessories, and other goods. At all times relevant hereto, IKEA maintained a principal place of business in this District at 420 Alan Wood Road, Conshohocken, Pennsylvania, 19428. IKEA also maintains its North American corporate headquarters at this location.

3. Tattar worked for IKEA in its Conshohocken corporate headquarters from on or about November 13, 2017 until IKEA terminated her employment on July 14, 2020.

4. At all times relevant hereto, IKEA had more than 15 employees and was/is an "employer" as defined by Title VII.

5. At all times relevant hereto, IKEA acted or failed to act by and through its authorized agents and/or employees, each of whom acted within the course and scope of their authority and employment with IKEA.

## JURISDICTION AND VENUE

6. On August 31, 2020, Tattar filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Pennsylvania Human Relations Commission ("PHRC"), thereby satisfying the requirements of 42 U.S.C. § 2000e-5. Tattar's EEOC Charge was docketed as EEOC Charge No. 530-2020-05465. Tattar's EEOC Charge was filed within one hundred eighty (180) days of her unlawful termination.

7. Tattar filed an Amended Charge of Discrimination ("Amended Charge") on November 25, 2020. Tattar also provided IKEA's counsel with a courtesy copy of the Amended Charge that same day.

8. IKEA submitted a Position Statement with the EEOC on December 22, 2020.

9. On February 1, 2021, the EEOC issued Tattar a Notice of Right to Sue, advising her that she had ninety (90) days to file suit against IKEA.

10. Tattar has exhausted her federal administrative remedies and has complied with all conditions precedent to maintaining this action.

11. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

12. Tattar reserves her right to amend this Complaint to include state law claims pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*, when those claims become ripe. At such time, the Court will have supplemental jurisdiction over Tattar's state law claims pursuant to 28 U.S.C. §1367 because those claims arise out of the same nucleus of operative facts as Tattar's claims under Title VII, the EPA, and the FLSA.

13. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as the parties reside in this judicial district and the events giving rise to this action occurred in this judicial district.

## FACTUAL BACKGROUND

### I. Tattar Joins IKEA and Excels Professionally.

14. In the fall of 2017, IKEA recruited Tattar to join its Human Resources department as a Recruiting Manager. At the time, Tattar was employed with Aramark Corporation as a Director, Talent Acquisition – Healthcare and Higher Education. Tattar joined IKEA on November 13, 2017.

15. As a Recruiting Manager, Tattar earned an annual salary of $140,000 plus bonus. She was also entitled to participate in IKEA's benefits programs, including among other things, a health care plan, a 401(k) plan, and IKEA's TACK loyalty program.

16. In October 2018, less than one year after she joined IKEA, and due to her exceptional performance, IKEA offered Tattar a promotion to the role of interim Vice President, Talent Acquisition Manager, reporting directly to Simon Lowes ("Lowes"), IKEA's North America Country Human Resources Manager ("CHRO").[2] In conjunction with this offer, IKEA increased Tattar's salary to $154,000 plus bonus and benefits.

17. In March 2019, IKEA offered Tattar another promotion to the role of Deputy People & Culture Manager, reporting directly to Lowes.  The anticipated start date for this role was June 1, 2019.  The increased salary associated with this position was $179,280 plus bonus and benefits. Unlike her other roles at IKEA, this position would make Tattar eligible for the One IKEA Bonus program, a discretionary bonus based upon her location performance.  In addition, as a member of the IKEA North America country management team, Tattar would be eligible to participate in IKEA's Supplemental Retirement Accumulation Plan ("SRAP"), which would allow her to voluntarily defer a portion of her salary or her One IKEA Bonus to a future date. Furthermore, IKEA would automatically contribute 10% of her annual base salary into the plan on her behalf.

18. However, before Tattar formally began this new role, IKEA withdrew the offer and decided to leave the role unfilled because, upon information and belief, another candidate for the role accused IKEA of discrimination in hiring, and IKEA was concerned about litigation from that employee. IKEA subsequently completed a global reorganization and offered Tattar the role of Vice President, Talent Management.

---

[2] CHRO is the title IKEA uses to refer to the head of human resources in a particular country.

19. In the role of Vice President, Talent Management, Tattar was responsible for four different teams, nine direct reports, and 70 indirect reports. Tattar's salary was $185,000 plus bonus.

20. Notably, before he left the company, the male employee whose job included the same common core of duties as Tattar's Talent Management role earned significantly more than Tattar. This gender-based pay disparity was not unusual at IKEA.

21. Tattar's job was to lead large-scale change, drive accountability, lead all Talent functions, and be an effective leader. As with the prior roles she held at IKEA, Tattar excelled, receiving an "Exceeds Expectations" on her annual performance review for every year she worked at the company.

22. Also in 2019, IKEA invited Tattar to participate in a highly selective six-month global leadership program based in Copenhagen, Denmark titled, "Fit for Transformation." Tattar was one of the youngest participants in the program and one of only three participants, out of fifteen, who were not country CHROs. The IKEA leadership in place at that time both in the United States and at the global headquarters in Sweden made it clear to Tattar that she had been invited to participate in the program because she was being groomed for a larger role.

23. However, as she advanced, Tattar had numerous interactions with IKEA executives that exemplified a culture at the company that discriminates against women, pays them less than their male counterparts, attempts to force them into stereotypical gender roles, castigates them for speaking out against discriminatory employment practices, and demands results-oriented leaders, but penalizes women, like Tattar, who attempt to drive performance.


## II. IKEA Discriminates Against Tattar and Pressures Her To Become a Female Archetype.

24. Tattar is an educated, competent, results-driven professional. A key component of her job as Talent Manager was to hold people accountable for their work and their interpersonal interactions, and, if necessary, to counsel employees to either improve or leave the company. She did this by being fair and straightforward and by having honest conversations with her team and colleagues.

25. However, during her employment with IKEA, Tattar was repeatedly told to be "softer," "more vulnerable," and instructed to "show more empathy."

26. On more than one occasion after attending meetings with IKEA's North America CEO, Javier Quinones ("Quinones"), he told her that she had not smiled enough during the meeting and instructed her to "smile more."

27. These comments were discriminatory and demeaning to a woman holding a leadership role with the company. However, they were not unusual for Quinones. For example, in a talent review meeting to discuss the promotion of a female employee from Store Manager to a Regional Vice President role, Quinones referred to the employee as "an old lady" to demonstrate his lack of support for her promotion.

## III. IKEA Pays Tattar, And Other Women, Less Than Their Male Counterparts.

28. In her role as Vice President, Talent Manager, Tattar was paid approximately 20% less than the male employee, Rich D'Amico, whose job included the same common core of duties as Tattar's Talent Management role.

29. When Tattar inquired why IKEA did not pay her an equivalent salary and why it refused to increase her salary to match Mr. D'Amico's, IKEA did not dispute that it had paid Mr.

D'Amico more than it paid her. Rather IKEA told Tattar that if it paid her an equivalent salary, it would violate IKEA's compensation guidelines because it would constitute a raise in excess of 20%. This arbitrary policy resulted in Tattar earning less than male counterparts.

30. Notably, Tattar was not the only woman at IKEA to receive a discriminatory salary on the basis of her sex.

31. In or around 2019, IKEA retained an outside consulting firm to investigate its salary practices and the firm found multiple instances of gender and race-based pay disparities across the company.

32. Despite the results of the study, when Tattar, in her role as Talent Manager, attempted to address the inequitable salaries paid to other female employees, her efforts were often rebuffed.

33. For example, Quinones refused to increase the salary of North America COO Leontyne Green Sykes ("Green Sykes") despite the fact that the outside firm had identified her as a female employee who was paid less than her similarly situated male counterparts.

34. Quinones also sought to diminish Ms. Green Sykes by promoting a male employee, Pedro Abrue ("Abrue"), with whom Quinones had worked in Europe, to share the North America COO role with her, essentially demoting Green Sykes by reducing her job functions and devaluing her in the eyes of her peers.

35. Ms. Green Sykes is no longer employed with IKEA. Tattar does not know whether her departure was voluntary or whether she was forced out of the company as Tattar was.

36. Quinones also declined to hire a qualified female candidate for an executive level role because to do so would have resulted in the female candidate receiving a salary that was 10% higher than his own. Quinones opted to hire a male candidate instead - at a salary that also exceeded his own.

37. In another example, neither Quinones nor IKEA as a whole expressed salary constraints when they promoted Phillip Wellington ("Wellington"), an IKEA store manager in Chicago, Illinois, to the position of North America CHRO in early 2020, after Lowes left the company.

38. Despite the fact that Wellington did not meet even a fraction of the key qualifications for the CHRO position, Quinones chose to hire Wellington and give him a 35% salary increase to take a position for which other, more qualified, female applicants were rejected.

39. IKEA's hiring policy dictated that, if a candidate did not meet the minimum technical requirements of the position, the candidate should not be considered for the role.

40. However, when Tattar raised concerns to Byron Clayton ("Clayton"), IKEA's Global Retail Human Resources executive, that Quinones wanted to hire Wellington rather than much stronger female candidates, and that Wellington did not meet the identified qualifications for the job, Clayton told her, in essence, to keep quiet and that it was more important to "put someone Javi likes" in the position versus someone who was qualified for the role. In fact, Clayton instructed Tattar to speak with Wellington in order for her to "get comfortable with Phil" as her "leader."

**IV.    IKEA Protects a Sexist and Racist Employee, Retaliates Against Tattar, and Terminates Her Employment.**

41. In the late fall of 2019 and the first half of 2020, Tattar performance-counseled a male employee named Rick Carsley ("Carsley"), whom she had hired and who reported directly to her.

42. Carsley consistently underperformed. He failed to meet the key expectations for his position and neglected to follow IKEA processes and policies.

43. Carsley's behavior was also problematic and violated of IKEA's Code of Conduct. In separate instances, and by way of example only, Carsley (1) belittled a female employee to her colleagues and former colleagues while drunk at a party; (2) compared IKEA's hiring practices to seducing a woman and spoke demeaningly about both on an industry podcast; and (3) engaged in overtly racist behavior. Specifically, in December 2019, Carsley put empty wrapped "presents" on the desks of two African American IKEA employees and signed the "presents" under the name of his white male peer.

44. A number of Tattar's direct reports and colleagues complained to her about Carsley's behavior and his work performance, and several indicated that he had made sexist comments and gestures, had engaged in racist behavior, and that they felt uncomfortable working with him.

45. As Talent Manager, Carsley's direct supervisor, and someone in a leadership role, it was incumbent upon Tattar to counsel Carsley concerning his behavior and his faulty performance, and to impress upon him the seriousness of his transgressions.

46. Tattar discussed Carsley's sexist and racist conduct with Wellington, her direct supervisor, on more than one occasion. She also discussed Carsley's poor work performance with Wellington and other peers during IKEA Talent Review meetings.

47. Tattar also consulted verbally, via email, and via Microsoft Teams, with two Human Resources business partners about Carsley's behavior and his progressive discipline: (1) Kim Taglieber ("Taglieber"), Director, Corporate Human Resources (Service Office - People & Culture Manager); and (2) Taglieber's direct report, Amy Vernon ("Vernon"), Corporate Human Resources (Service Office - People & Culture Business Partner).

48. With the support of her Human Resources partners, Tattar attempted to counsel Carsley on multiple occasions over the course of approximately five months. When Carsley's

performance and conduct did not improve, Tattar placed Carsley on Final Corrective Action in April/May 2020.

49. IKEA has three levels of Corrective Action: Written Corrective Action, Final Corrective Action, and Termination.  Tattar and Taglieber had multiple conversations about whether Carsley's Corrective Action should be a Written or Final Corrective Action.  Taglieber indicated to Tattar that she was supportive of either. Vernon indicated to Tattar that Carsley's behavior on the podcast was reason enough for termination.

50. Tattar understands that, after she placed Carsley on Final Corrective Action, he complained to IKEA about her alleged unfair treatment of him (a complaint that IKEA has refused to provide to Tattar).

51. On June 2, 2020, Wellington abruptly placed Tattar on a forced leave of absence while IKEA investigated the "allegations" against her.

52. IKEA separated Tattar from her job for six weeks, during which time it instructed her colleagues to refrain from speaking with her, and refused to provide her with any information regarding the allegations against her.

53. This extended leave of absence caused significant damage to Tattar's professional reputation.

54. IKEA's actions also caused Tattar significant physical and emotional stress and exacerbated her pre-existing post-partum depression, a condition about which she made Wellington, her team, and multiple other IKEA employees, aware.

55. When Tattar reached out to Wellington during her enforced leave and requested information regarding the mental health resources available to her as an IKEA employee,

Wellington ignored her requests for help, and IKEA as an organization failed to accommodate her.[3]

56. The stress and anxiety caused by her leave of absence and the accusations against her were so severe that, after Tattar experienced multiple panic attacks and, one night, was vomiting all evening, her husband insisted that she have an emergency medical visit.

57. Although IKEA made a show of fairly "investigating" the claims against her, including asking her which IKEA employees she thought the investigator should speak with about her qualities as an employee and a supervisor, the investigator did not speak with all of the employees Tattar identified, demonstrating the pretext and retaliatory nature of the process.

58. After six-weeks of so-called "investigation," IKEA terminated Tattar's employment on July 14, 2020, and fabricated reasons to justify it.

59. In the Corrective Action that Wellington issued to Tattar in connection with her termination, IKEA accused Tattar of falsifying Vernon's signature on Carsley's Final Corrective Action and asserted that she did not consult with Human Resources on Carsley's progressive discipline – neither of which is true.

60. Tattar conferred extensively with Taglieber and Vernon concerning Carsley's troubling behavior and underperformance, and Taglieber (Vernon's supervisor) supported the issuance of either a Written or Final Corrective Action to Carsley.

---

[3] Wellington also refused to provide Tattar with access to her personnel file in violation of the Pennsylvania Personnel File Inspection Act, 43 Pa. Stat. Ann. §§ 1321-1324. Tattar sent an email to Wellington on June 8, 2020, while still an IKEA employee, requesting access to her full personnel file. Wellington responded via email on June 10, 2020, and stated, "I will not be producing any documents." It was only when counsel for Tattar requested access to the file that IKEA produced a portion of it *six weeks later*. IKEA persists in its refusal to produce anything associated with the complaint against Tattar and the investigation.

61. Tattar never falsified Vernon's signature on the Corrective Action, nor would she have done so. On the copy of Carsley's Final Corrective Action that IKEA's own investigator provided to Tattar during the internal review, Vernon's signature line and her document review date are blank. Tattar only indicated where Vernon should sign the document after review, a common clerical courtesy; she never signed on Vernon's behalf.

62. By falsely accusing Tattar of forgery and other misconduct to "justify" her termination, IKEA made its retaliatory animus plain.

63. Tattar's Corrective Action also accused her of "targeting" Carsley after "he made certain comments" about a female colleague. By targeting, IKEA means counseling Carsley regarding his sexist and racist behavior and poor work performance, a key component of Tattar's job.

64. The Corrective Action issued to Tattar demonstrates that IKEA's primary concern was protecting a sexist and racist employee over a female leader who attempted to correct his improper behavior.

65. The rest of the Corrective Action criticizes Tattar for doing exactly what she was hired to do and what she was praised for in her annual reviews: driving accountability and increasing employee performance.

66. Notably, IKEA never counselled Tattar during her employment concerning this supposedly problematic behavior nor did it give her any written warnings or progressive discipline.

67. IKEA's post hoc criticisms underscore IKEA's hostility to the fact Tattar was a woman in a leadership position who did not fit into IKEA's idea of what a female employee should be: soft, vulnerable, and always smiling.

68. Incredibly, after IKEA terminated Tattar's employment, it also fired two of the employees who had complained to Tattar, and to Human Resources, about Carsley's behavior.

69. Tattar refused to be silent. She refused to stand by as IKEA discriminated against her and other women in words and deeds, attempting to force her to adhere to stereotypical gender norms and paying her and other women less than their male counterparts.

70. She did her job and excelled at it, including counseling a sexist and racist subordinate to correct his behavior or face termination.

71. For this, IKEA terminated her and two employees who also complained.

72. IKEA's actions were discriminatory and retaliatory in violation of federal law.

73. As a direct result of IKEA's deliberate, unlawful, outrageous and malicious actions, Tattar has suffered and continues to suffer severe emotional distress, anxiety, depression, humiliation, a loss of life's pleasures, the loss of self-esteem, damage to her professional status and reputation, and a painful diminution of her ability to provide herself with the earned rewards of excellence in her chosen profession. She will continue to suffer the same into the future.

74. By discriminating against Tattar, retaliating against her for engaging in protected activity, and terminating her employment, IKEA engaged in intentional and extremely outrageous conduct, and/or acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow, and proximately caused Tattar's severe emotional and physical distress.

75. Tattar will continue to suffer injury and monetary damages because of the IKEA's discriminatory and retaliatory conduct unless and until this Court grants the relief requested herein.

## COUNT I
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## 42 U.S.C.S. § 2000e, *et seq*.
## SEX DISCRIMINATION AND WRONGFUL TERMINATION

76. Paragraphs 1 through 75 are hereby incorporated by reference, as though the same were fully set forth herein.

77. Title VII provides that it is an unlawful employment practice for an employer to "discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin…." *42 U.S.C. § 2000e-2(a)(1)*.

78. IKEA is an employer within the meaning of Title VII because it employed at least fifteen (15) employees throughout its various locations at all times material hereto.

79. Tattar is a female and therefore a member of a protected class.

80. At the time of her unlawful termination, Tattar was qualified for her position and had received "exceeds expectations" on each of her annual performance reviews.

81. IKEA discriminated against Tattar because of her sex by making sexist comments to her, pushing her to conform to stereotypical gender norms, and paying her less than her male counterpart.

82. In violation of Title VII, IKEA took tangible employment action against Tattar in the form of an enforced leave of absence and, ultimately, termination because of her sex.

83. IKEA acted with malice and reckless indifference to Tattar's civil rights and emotional and physical wellbeing.

84. Because of IKEA's deliberate, unlawful, wanton, and malicious actions as set forth above, Tattar suffered damages in the form of, *inter alia*, loss of past and future wages and

compensation, physical and emotional distress, damages to reputation, personal humiliation, and loss of life's enjoyment.

## COUNT II
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e, *et seq*.
### SEX DISCRIMINATION (DISCRIMINATORY COMPENSATION)

85. Paragraphs 1 through 84 are hereby incorporated by reference, as though the same were fully set forth herein.

86. Title VII provides that it is an unlawful an employer to adopt a "discriminatory compensation decision or other practice" or to subject an individual to a "discriminatory compensation decision." *42 U.S.C. § 2000e-5(e)(2)*.

87. IKEA is an employer within the meaning of Title VII because it employed at least fifteen (15) employees throughout its various locations at all times material hereto.

88. Tattar is a female and therefore a member of a protected class.

89. While employed by IKEA, IKEA paid Tattar approximately 20% less than a similarly situated male employee.

90. By discriminating against Tattar through unequal pay, IKEA violated Title VII.

91. Because of IKEA's deliberate, unlawful, wanton, and malicious actions as set forth above, Tattar suffered damages in the form of, *inter alia*, loss of past and future wages and compensation, physical and emotional distress, damages to reputation, personal humiliation, and loss of life's enjoyment.

## COUNT III
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C.S. § 2000e, *et seq*.
### RETALIATION (WRONGFUL TERMINATION)

92. Paragraphs 1 through 91 are hereby incorporated by reference, as though the same were fully set forth herein.

93. Title VII provides that it is an unlawful employment practice for an employer to "discriminate against any of his employees… because he has opposed any practice made an unlawful employment practice by this title (42 UCSC §§2000e-2000e-17)…" *42. U.S.C. §2000e-3(a).*

94. IKEA is an employer within the meaning of Title VII because it employed at least fifteen (15) employees throughout its various locations at all times material hereto.

95. Tattar is a female and therefore a member of a protected class.

96. While Tattar was employed with IKEA, she opposed IKEA's, and its employee's, discriminatory conduct, including (1) opposing IKEA's gender discriminatory pay practices; and (2) opposing a male employee's sexist and racist conduct, including placing him on Final Corrective Action.

97. Tattar's opposition to this discriminatory conduct was clear and unequivocal.

98. In violation of Title VII, IKEA took tangible employment action against Tattar in the form of an enforced leave of absence and, ultimately, termination in retaliation for the actions described herein.

99. IKEA acted with malice and reckless indifference to Tattar's civil rights and emotional and physical wellbeing.

100. Because of IKEA's deliberate, unlawful, wanton, and malicious actions as set forth above, Tattar suffered damages in the form of, *inter alia*, loss of past and future wages and compensation, physical and emotional distress, damages to reputation, personal humiliation, and loss of life's enjoyment.

**COUNT IV**
**EQUAL PAY ACT OF 1963**
**29 U.S.C. § 206(d)**
**UNEQUAL PAY BASED ON GENDER**

101. Paragraphs 1 through 100 are hereby incorporated by reference, as though the same were fully set forth herein.

102. The Equal Pay Act of 1963 provides that it is unlawful for an employer to discriminate between employees who perform equal work under similar working conditions on the basis of their gender. *29 U.S.C. §206(d)(1)*.

103. While employed by IKEA, IKEA paid Tattar approximately 20% less than her male comparator.

104. Because of IKEA's actions as set forth above, Tattar suffered damages in the form of, *inter alia*, loss of past and future wages and compensation, physical and emotional distress, damages to reputation, personal humiliation, and loss of life's enjoyment.

**COUNT V**
**FAIR LABOR STANDARDS ACT**
**29 U.S.C. § 215(a)(3)**
**RETALIATION**

105. Paragraphs 1 through 104 are hereby incorporated by reference, as though the same were fully set forth herein.

106. The Fair Labor Standards Act provides that it is unlawful for any person to discharge or discriminate against an employee because the employee has filed a complaint related to the Act. *29 U.S.C. § 215(a)(3)*.

107. The FLSA's antiretaliation provision is applicable to Equal Pay Act retaliation claims.

108. While employed by IKEA, IKEA paid Tattar approximately 20% less than her male comparator.

109. While employed by IKEA, Tattar witnessed other female employees receive less pay than their similarly situated male counterparts.

110. After Tattar raised both her own and others' gender-based pay inequities with IKEA senior management, IKEA retaliated against her and terminated her employment.

111. Because of IKEA's deliberate, unlawful, wanton, and malicious actions as set forth above, Tattar suffered damages in the form of, *inter alia*, loss of past and future wages and compensation, physical and emotional distress, damages to reputation, personal humiliation, and loss of life's enjoyment.

**WHEREFORE**, as a result of IKEA's unlawful conduct, Tattar respectfully requests that this Court enter judgment in her favor and against IKEA and grant the maximum relief allowed by law, including, but not limited to:

A. Back wages and front pay, in an amount to be determined at trial, but no less than One Million Dollars ($1,000,000.00);

B. Punitive, compensatory, and/or exemplary damages in an amount to be determined at trial, but sufficient to punish IKEA for its intentional, negligent, willful, wanton, and/or malicious conduct;

C. Tattar's costs, disbursements, and attorney's fees incurred in prosecuting this action;

D. Pre-judgement interest in an appropriate amount; and

E. Such other and further relief as is just and equitable under the circumstances.

**JURY DEMAND**

Tattar herby demands a trial by jury as to all issues so triable.

                              Respectfully submitted,

                          By: */s/ Rachael Luken Carp*
                              Michael J. Fortunato, Esquire (PA Bar No. 58917)
                              Rachael Luken Carp, Esquire (PA Bar No. 201585)
                              Rubin, Fortunato & Harbison P.C.
                              10 S. Leopard Road
                              Paoli, PA 19301
                              T: 610-408-2005/2010
                              F: 610-854-4305/4329
                              mfortunato@rubinfortunato.com
                              rcarp@rubinfortunato.com
                              *Attorneys for Plaintiff, Eleanor Lisle Tattar*

Dated: February 26, 2021